UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| AJ MILLER, ) | |
|     *Plaintiff*, ) | |
| ) | |
|     *vs.* ) | 1:10-cv-1665-JMS-TAB |
| ) | |
| ELI LILLY & COMPANY, ) | |
|     *Defendant.* ) | |

### ORDER ON MOTION FOR SUMMARY JUDGMENT

Presently pending before the Court is Defendant Eli Lilly & Company's ("Lilly") Motion for Summary Judgment. [Dkt. 51.] Plaintiff AJ Miller alleges that Lilly discriminated against him on the basis of his race when it failed to award him a merit pay increase for his 2006 performance. Mr. Miller also alleges that he was subjected to a hostile work environment. For the following reasons, the Court's grants Lilly summary judgment on Plaintiff AJ Miller's hostile work environment claim and denies Lilly summary judgment on Mr. Miller's disparate pay claim.

### I.
### BACKGROUND[1]

Under established policy during the relevant time period, Lilly followed a "pay for performance" philosophy. [Dkt. 51-4 at 3.] "[P]ay increases were based on, among other things, performance relative to group and individual objectives, performance behaviors and 'position in

---

[1] As Mr. Miller points out in his response brief, the background section of Lilly's brief, which is supposed to contain the facts in the light most favorable to non-movant Mr. Miller, contains argument, rhetoric, and spin that is not supported by the evidence cited. [*See* dkt. 56 at 1-5 (detailing Mr. Miller's legitimate disagreements with Lilly's version of the "undisputed" facts).] The Court notes that at times, Lilly's argumentative tone sounds more like a closing argument than a neutral recitation of the facts. The Court reminds Lilly that unless it can win as a matter of law on the plaintiff's version of the material facts, as supported by evidence, the Court cannot and will not award summary judgment.

salary range'—*i.e.*, where the employee's salary fell within the range established by his 'pay group level.'" [*Id.*] The higher the employee's salary within its range, the harder it would be to obtain a merit increase. [*Id.*] Merit pay increases for successful performance were phased out entirely if an employee reached 75% of the range. [*Id.*]

Lilly hired Mr. Miller in 1999 to serve as an international marketing manager for Elanco, its animal health division. [Dkt. 51-1 at 7.] Mr. Miller was based in Indianapolis and did not have any direct reports. [*Id.*] He was classified within pay level 60 with an annual salary of $93,000. [Dkt. 51-4 at 6.] Mr. Miller received merit pay increases in that position. [*Id.*]

After approximately four years, Mr. Miller applied for and received a pharmaceutical sales position in the Gamma primary care sales division in Hamilton, Ohio. [Dkt. 51-1 at 8-9.] In this position, Mr. Miller supervised sales representatives working with primary care physicians. [Dkt. 51-1 at 9.] Greg James was Mr. Miller's manager. [*Id.*] Mr. James completed Mr. Miller's evaluation for 2004 and wrote that

> AJ started off the year with a Strong Quarter #1 in portfolio rank for Gamma, then sales results and rank dropped. The Cincinnati team needs to show better sales results in 2005. As the Cialis product Champion for the MWA Gamma team, AJ improved every quarter in his leadership of the team. He is a role model for the Lilly values, consistently showing integrity and seeking excellence, while respecting his people. I look forward to a great year in 2005 from the Cincinnati District.

[Dkt. 51-2 at 2.] Mr. Miller received primarily "successful" ratings for performance behavior, with an "exemplary" rating for modeling the values of the company and a "needs improvement" rating for achieving results with people. [*Id.*] Mr. Miller received an overall individual performance rating of "successful" for 2004 and was deemed eligible for, and received, a merit pay increase for 2004. [Dkts. 51-2 at 2; 51-4 at 6.]

In Mr. Miller's 2005 evaluation, Mr. James noted that Mr. Miller's portfolio sales were "in the middle of the rankings [and that] improvement in overall portfolio sales could improve."

[Dkt. 56-7 at 125.] Mr. Miller received "successful" ratings in all categories, including the "achieve[s] results with people" category, and was deemed eligible for, and received, a merit pay increase for 2005. [*Id.* at 5-6; 51-4 at 6.]

As the result of a sales force realignment, Mr. Miller moved to a district sales manager of neuroscience position for the territory in Dayton, Ohio in January 2006. [Dkt. 51-1 at 9.] In this position, Mr. Miller managed a larger territory and was supervised by Sherry Korczynski. [*Id.*]

In November 2006, Ms. Korczynski informed Mr. Miller that she was giving him a formal written warning "due to unacceptable work performance" relating to the district sales manager position. [Dkt. 56-7 at 132.] The written warning listed multiple lapses Ms. Korczynski found with Mr. Miller's performance, including, among other things, 1) his failure to sufficiently individualize the development plans of his sales representatives to incorporate any new information following performance assessment sessions; 2) his failure to provide specific ways his sales representatives could improve their selling techniques; 3) his failure to sufficiently model the Zyprexa sales message; 4) the manner in which he handled a situation involving an employee (Sara Gribbons) in apparent violation of Lilly's "Red Book" policy; 5) his failure to effectively communicate with his sales team, as reported by a team member who Ms. Korczynski relayed "reported that you pound your fist on their dashboard while in the car with them, thus making them feel uncomfortable and a bit nervous[;]" and 6) his inability to connect with his team and his controlling, micromanaging behavior. [Dkt. 56-7 at 132-33.]

In Mr. Miller's 2006 performance review, Ms. Korczynski noted that Mr. Miller's sales performance was 98% of quota, which placed him "near the bottom of the nation, which is unacceptable." [Dkt. 51-2 at 20.] Mr. Miller received three "successful" ratings and four "needs improvement" ratings. [*Id.*] Ultimately, Ms. Korczynski found Mr. Miller to be ineligible for a

merit pay increase for his 2006 performance. [*Id.*] Although Mr. Miller was ineligible for a merit pay increase that year, he received a "competency bonus" of $4,800. [Dkt. 51-4 at 17.]

In December 2006, Mr. Miller signed the acknowledgement of written warning and the proposed action plan, adding his belief that the criticisms of his performance "are inaccurate, biased, and one sided." [Dkt. 51-2 at 34.] The action plan detailed various performance expectations for Mr. Miller. [*Id.*] Mr. Miller was warned that failure to complete the prescribed action plan during the "probationary period" could subject him to "the next stage of the disciplinary model, which is probation." [*Id.*]

In August 2007, Bridget Franz McIntee replaced Ms. Korczynski as Mr. Miller's manager. [Dkt. 51-5 at 2.] During that time she also supervised Richard Cawthorne, Geoffrey Tomb, Lance Hamblin, and several other district sales managers. [*Id.*] Ms. McIntee became aware of Mr. Miller's alleged performance deficiencies from Ms. Korczynski's supervisor file. [*Id.* at 3.] Ms. McIntee attests that several of her early interactions with Mr. Miller "were consistent with the deficiencies Ms. Korczynski documented in his file—especially as they related to sales representative recruitment and development." [*Id.* at 4.] Mr. Miller recalls Ms. McIntee as being "very defensive [and] argumentative" right from the beginning of her time as his manager. [Dkt. 51-1 at 37.]

In September 2007, Mr. Miller took medical leave to have surgery on a torn labrum he incurred on a work-related rafting trip. [Dkt. 51-1 at 10-11.] While he was on medical leave, and with no expectation that he would read it, Ms. McIntee sent Mr. Miller an email following up on an in-person discussion they had and acknowledging Mr. Miller's short-term goal to get back to Indianapolis. [Dkt. 51-3 at 17.] Ms. McIntee evaluated Mr. Miller's performance based on her three weeks as his supervisor and concluded that it was "not standard for a [district sales

manager], especially one with 3 years experience." [*Id.*]  She encouraged him to "think of alternative options." [*Id.*]

When Mr. Miller returned from leave, Ms. McIntee contacted him about the possibility of him transferring to an executive sales representative position.  [Dkt. 51-5 at 5.]  Ms. McIntee contacted Mr. Miller again the following day to see whether he had further thoughts on the issue, but Mr. Miller told Ms. McIntee that he would not make a career decision while under the influence of pain medication from his surgery.  [Dkt. 51-1 at 38.]  Ms. McIntee ultimately contacted Mr. Miller about a possible transfer multiple other times, telling him that if he "didn't step down by a certain time in December, [he] was taking [his] chances."  [*Id.* at 40.]  Mr. Miller took additional leave in December and ultimately resigned his employment in a letter dated January 2, 2008.  [Dkt. 51-2 at 43.]

## II.
### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor.  *See* Fed. R. Civ. Pro. 56.  To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial.  Fed. R. Civ. Pro. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. Pro. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to

support the fact. Fed. R. Civ. Pro. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. Pro. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially the grant of summary judgment. Fed. R. Civ. Pro. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.*, 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id*. at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims or a defendant's affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). And when evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial . . . against the moving party." *Celotex*, 477 U.S. at 330.

### III.
#### DISCUSSION

Lilly argues that it is entitled to summary judgment on Mr. Miller's disparate pay claim and his hostile work environment claim. Mr. Miller argues that he has presented issues of material fact on each of his claims that are sufficient to defeat summary judgment.

### A. Disparate Pay Claim

Lilly argues that Mr. Miller has not established a prima facie case of discrimination because he has not identified a sufficiently similar comparator to show that Lilly's failure to give him a merit pay increase in 2006 was discriminatory. Additionally, Lilly argues that even if Mr. Miller establishes a prima facie case, he cannot show that Lilly's proffered non-discriminatory reason is pretext.

*1. Analyzing § 1981 Claim on Summary Judgment*

Mr. Miller asserts a disparate pay claim pursuant to 42 U.S.C. § 1981. To overcome a § 1981 claim on summary judgment, Mr. Miller may proceed by either providing direct evidence of discrimination, *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), or by showing indirect evidence under the burden-shifting analysis of *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999) (holding that to analyze a § 1981 claim on summary judgment, "we employ the same framework that we use with respect to Title VII claims"). Mr. Miller relies on the indirect method.

To survive summary judgment, Mr. Miller must first establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. Specifically, he must show that (1) he was a member of a protected class, (2) that he adequately performed his employment responsibilities, (3) that despite adequate performance, he suffered an adverse employment action, and (4) that he received different treatment than similarly situated persons who were not members of the same protected class. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) (citation omitted). If Mr. Miller can make that showing, the burden shifts to Lilly to come forth with a "legitimate, non-discriminatory reason" for its actions. *Hill v. Potter*, 625

F.3d 998, 1001 (7th Cir. 2010) (citation omitted). If Lilly can do so, it will prevail unless Mr. Miller can come forward with evidence that the proffered non-discriminatory reason is "a pretext for intentional discrimination." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540 (7th Cir. 2011) (citation omitted).

The similarly-situated inquiry and the pretext inquiry "are not hermetically sealed off from one another." *Coleman*, 667 F.3d at 857-58. Specifically, in cases such as this one where the plaintiff argues that an employer's discipline has been handed out in an uneven manner, "the similarly-situated inquiry dovetails with the pretext question." *Coleman*, 667 F.3d at 858. Under those circumstances, "comparator evidence can do 'double-duty' at both the prima facie and pretext stages." *Id.*

### 2. Similarly Situated Comparator

The parties do not dispute that Mr. Miller is a member of a protected class or that his failure to receive a merit pay increase for 2006 is an adverse employment action. Instead, the parties dispute whether Mr. Miller has proffered a similarly situated comparator and whether he was adequately performing his employment responsibilities to establish a prima facie case of discrimination.

Although Lilly disputes that Mr. Miller was adequately performing his employment responsibilities, in a case like this where the employee alleges that he was disciplined more harshly than other employees who had similar employment issues, the plaintiff "does not have to show that [he] was meeting [his] employer's legitimate expectations in order to establish a prima facie case." *Flores v. Preferred Tech. Group*, 182 F.3d 512, 515 (7th Cir. 1999). Therefore, to make a prima facie case of employment discrimination, Mr. Miller only must show that he

received different treatment than similarly situated persons who were not members of the same protected class.

The Seventh Circuit Court of Appeals recently emphasized that "the similarly-situated inquiry is flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Although similarly situated employees must be "directly comparable to the plaintiff in all material respects," they "need not be identical in every conceivable way[,]" and the Court is "looking for comparators, not clones." *Id.* at 846 (citations omitted). As long as distinctions between the plaintiff and the proposed comparator are not "so significant that they render the comparison effectively useless," the similarly-situated requirement is satisfied. *Id.* Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when "no reasonable fact-finder could find that plaintiff [has met his] burden on the issue." *Id.* at 847.

Typically, a plaintiff must at least show that a comparator (1) had the same supervisor; (2) was subject to the same standards; and (3) engaged in "similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citation omitted). The Seventh Circuit cautioned, however, that these factors are "not a 'magic formula'" and that the "similarly-situated inquiry should not devolve into a mechanical, one-to-one mapping between employees." *Id.* (citation omitted).

Mr. Miller proffers multiple comparators, including Jennifer Cahn, Jennifer Burns, Geoffrey Tomb, and Lance Hamblin. Lilly does not dispute that these employees held the same position as Mr. Miller, were also supervised by Ms. Korczynski during 2006, and were not members of Mr. Miller's protected class. While the parties analyze the similarities and differences be-

tween Mr. Miller and each of these proffered comparators, the Court finds Mr. Miller to be similarly situated to Mr. Hamblin for purposes of proving a prima facie case.[2] Therefore, the Court will only address Mr. Hamblin for purposes of this analysis.[3]

In 2006, Mr. Miller and Mr. Hamblin had the same position, the same supervisor (Ms. Korczynski), and the same pay grade at Lilly. [Dkts. 51-2 at 20; 56-3 at 40.] Mr. Miller had various issues with his sales representatives, as described in the background section, but so did Mr. Hamblin. In fact, Ms. Korczynski confirmed to Mr. Miller that the issues he had with his sales representatives were similar to issues Mr. Hamblin had with his sales representatives. [Dkt. 56-7 at 23-24.]

For example, one of Mr. Hamblin's sales representatives, Monica Gillison, contacted multiple Lilly executives, including Ms. Korczynski's boss and various human resource representatives, regarding what she perceived to be an unfair evaluation she received from Mr. Hamblin. [Dkt. 56-3 at 53-56.] Ms. Gillison stated that a recent discussion with Mr. Hamblin had made her "question whether or not [Lilly] truly values diversity." [Dkt. 56-3 at 55.] Although she assured the representatives that she did not want to leave Lilly, Ms. Gillison concluded that

---

[2] In its reply, Lilly argues that the Court should not consider Mr. Hamblin because Mr. Miller allegedly failed to supplement his interrogatory responses to add Mr. Hamblin as a comparator. [Dkt. 64 at 2 n.1.] The Court rejects Lilly's argument because Mr. Miller specifically identified Mr. Hamblin in his interrogatory responses as a "non-black employee who [he] contend[s] Lilly treated more favorably." [Dkt. 51-2 at 49-50.]

[3] The Court emphasizes that its finding that Mr. Hamblin and Mr. Miller are sufficiently similar to preclude summary judgment is not a finding as a matter of law. The Court has only been asked to enter summary judgment in favor of Lilly, and it finds that it cannot do so for the reasons stated herein. The Court reminds the parties that the *McDonnell-Douglas* burden-shifting framework that applies on summary judgment does not apply to the jury's determination of this case at trial. *See Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994). Therefore, although the Court will address the evidence pertaining to Mr. Hamblin, at trial Mr. Miller is free to present admissible evidence regarding other employees he believes he was treated worse than because of his race. Likewise, Lilly can present evidence to distinguish Mr. Hamblin.

she was "not sure what the future holds for me at [Lilly]" because Mr. Hamblin made it "evident that leadership still has a lack of value for diversity." [*Id.*]

Mr. Hamblin also had an admittedly "strained" relationship with another one of his sales representatives, Tonya Johnson-Gilliam. [Dkt. 56-10 at 23.] Ms. Johnson-Gilliam asked Mr. Hamblin to follow her in his own car on sales calls instead of riding in the same car, as was customary. [Dkt. 56-10 at 21-23.] Others were aware of Ms. Johnson-Gilliam's issues with Mr. Hamblin, which earned him the nickname "Side Car." [Dkt. 56-10 at 23.]

Mr. Miller and Mr. Hamblin both had sales performance issues in their district in 2006. Mr. Miller finished the year at 98% of quota, which Ms. Korczynski reported was "unacceptable." [Dkt. 51-2 at 20.] While Ms. Korczynski did not specifically list Mr. Hamblin's quota performance on his review, she noted that his "district struggled from a sales perspective." [Dkt. 56-3 at 40.]

Ms. Korczynski gave Mr. Miller a written warning for his 2006 performance and the issues he had with his sales representatives. [Dkt. 56-7 at 132-33.] However, she praised Mr. Hamblin in his review and concluded that she was "proud of his performance in 2006." [Dkt. 56-3 at 40.] Ultimately, Ms. Korczynski declared Mr. Miller to be ineligible for a merit pay increase for 2006, [dkt. 51-2 at 20], and approved Mr. Hamblin for a merit pay increase, [dkts. 56-3 at 40; 56-5 at 3-5].[4]

---

[4] Lilly's argument that Ms. Korczynski was unaware of Mr. Hamblin's issues with his sales representatives ignores the evidence as construed in a light most favorable to Mr. Miller. For example, Mr. Hamblin confirmed that his typical practice was to discuss issues regarding his sales representatives, including their yearly reviews, with Ms. Korczynski. [Dkt. 56-10 at 9-10, 24.] And it is unclear how Ms. Korczynski could have concluded that Mr. Miller's issues with his representatives were similar to Mr. Hamblin's issues if she was unaware of Mr. Hamblin's issues in the first place. [Dkt. 56-7 at 23-24.]

The Court concludes that there are enough common factors between Mr. Miller and Mr. Hamblin to allow for a meaningful comparison between the employees. Although Lilly downplays the similarities between Mr. Miller and Mr. Hamblin and emphasizes the differences, it ignores the teachings of *Coleman* and seeks the one-to-one mapping between employees that the Seventh Circuit has rejected. 667 F.3d at 847. The main difference between Mr. Miller and Mr. Hamblin for the year at issue is that Mr. Miller received a written warning from Ms. Korczynski, while Mr. Hamblin received her praise for similar performance. Because Mr. Miller argues that Ms. Korczynski disciplined him and not Mr. Hamblin because of Mr. Miller's race (and various evidentiary discrepancies taken in a light most favorable to Mr. Miller, as described in the pretext section below, may support that point), this difference is not fatal to Mr. Miller's claim.

The Court concludes that a reasonable fact-finder could find that Mr. Miller was treated differently than Mr. Hamblin because of his race when he was denied a merit pay increase for 2006. Accordingly, Mr. Miller has presented a prima facie case of employment discrimination

### 3. Pretext

Lilly argues that Mr. Miller did not receive a merit pay increase for 2006 because of his district's sales deficiencies, his issues with sales representatives, and the written warning he received from Ms. Korczynski. As the Court has already noted, however, in cases such as this where the plaintiff argues that the employer's discipline has been handed out in an uneven manner, "the similarly-situated inquiry dovetails with the pretext question" and "comparator evidence can do 'double-duty' at both the prima facie and pretext stages." *Coleman*, 667 F.3d at 858. Therefore, the Court's analysis regarding the similarities between Mr. Miller and Mr. Hamblin also supports the conclusion that Lilly's proffered non-discriminatory reason is pretextual. Although the Court could stop its analysis here, various exaggerations and discrepancies

between Ms. Korczynski's assessment of Mr. Miller and the evidence further supports the Court's conclusion regarding pretext.

For example, Ms. Korczynski gave Mr. Miller a written warning, in part, because "[r]epresentatives in your district have reported that you yell at them regarding their performance [and that] representatives have reported that you pound your fist on their dashboard while in the car with them, thus making them feel very uncomfortable and a bit nervous." [Dkt. 51-2 at 30-31.] That accusation appears to be based on the report of one representative (not multiple) who stated that Mr. Miller "pounded his finger" (not his fist) on the dashboard. [Dkt. 56-5 at 17.] There is no evidence of Mr. Miller yelling at representatives.

Additionally, Mr. Miller was cited by Ms. Korczynski for focusing too much on sales results instead of on fostering leadership behaviors. [Dkt. 51-2 at 30.] He attests, however, that before his written warning, Ms. Korczynski "constantly talked about, we have to hit the numbers. Numbers was what she talked about, numbers, numbers, numbers." [Dkt. 56-7 at 85.] This is supported by Ms. Korczynski's emphasis on sales numbers in the performance reviews.

Finally, in connection with the incident with Sara Gribbons where Ms. Korczynski accused Mr. Miller of violating Lilly policy by leaving Ms. Gribbons with the impression that she was to contact him before the compliance department with any concerns about violations of company policy, [dkt. 51-2 at 30], Ms. Korczynski (and Lilly) ignore Mr. Miller's evidence that the compliance department supported the notion that Ms. Gribbons may have talked to her supervisor, Mr. Miller, before it, [dkt. 56-8 at 12].[5]

---

[5] Although Lilly argues that this evidence is hearsay, Mr. Miller attests that the notes at issue were written contemporaneously with his discussion with Ms. Gribbons; therefore, they are admissible on summary judgment as a present sense impression to the hearsay rule. Fed. R. Civ. Pro. 803(d)(1).

The Court concludes that the comparator evidence described in the previous section, combined with the evidence of discrepancies surrounding Ms. Korczynski's written warning, is sufficient to create an issue of material fact regarding pretext. For that reason, the Court denies Lilly's request for summary judgment on Mr. Miller's disparate pay claim regarding the 2006 merit pay increase.

### B. Hostile Work Environment Claim

Mr. Miller claims that he was subjected to a hostile work environment because his second supervisor, Ms. McIntee subjected him to "multiple inquir[i]es as to whether he would accept a demotion to an Executive Sales Representative position in Indianapolis." [Dkt. 56 at 31.]

To survive summary judgment on a hostile work environment claim against an employer, the employee must show: "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 566 (7th Cir. 2004). In evaluating the severity and pervasiveness of the conduct, we examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Russell v. Bd. of Trustees of Univ. of Ill. at Chicago,* 243 F.3d 336, 343 (7th Cir. 2001). To satisfy the "severe or pervasive" element, the employee must show that the work environment was both subjectively and objectively offensive, such that "a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Smith*, 388 F.3d at 566. The workplace that is actionable is one that is "hellish." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 977 (7th Cir. 2004).

The Court concludes that Mr. Miller has failed to make a prima facie case for his hostile work environment claim because he has not shown that his work environment was both subjectively and objectively hostile. Even construed in a light most favorable to Mr. Miller, the evidence on which Mr. Miller bases his claim simply shows that a supervisor, Ms. McIntee, asked him an unspecified number of times about the possibility of transferring to a position in Indianapolis. [Dkt. 51-1 at 39-40.] Mr. Miller would have maintained his base salary in the new position, [dkt. 51-5 at 5], and it would have fulfilled his stated desire to "get back to Indy as soon as possible," [dkt. 51-3 at 17]. The Court notes that Mr. Miller never declined the job opportunity presented by Ms. McIntee, and there is no evidence that he told her to stop asking him about the position. These allegations, even construed in a light most favorable to Mr. Miller, are not close to the type of hostile environment necessary to support a claim of this nature. Therefore, the Court grants summary judgment in favor of Lilly on Mr. Miller's hostile work environment claim.

## IV.
### CONCLUSION

For the reasons explained herein, the Court **GRANTS** Lilly's Motion for Summary Judgment with respect to Mr. Miller's hostile work environment claim and **DENIES** it with respect to Mr. Miller's disparate pay claim. [Dkt. 51.]

07/30/2012

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP - Indianapolis
ellen.boshkoff@faegrebd.com

Johane J. Domersant
BAKER & DANIELS, LLP
johane.domersant@bakerd.com

Benjamin C. Ellis
BETZ & BLEVINS
bellis@betzadvocates.com

Brandon Jamison
SANFORD WITTELS & HEISLER, LLP
bjamison@swhlegal.com

Matthew Louis Schmid
SANFORD WITTELS & HEISLER, LLP
mschmid@swhlegal.com